**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
--------------------------------------------------X

| | | |
|---|---|---|
| **CASEY STERN,** | : | |
| | : | Civil Case No. _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| **WARNER MEDIA, LLC** | : | |
| | : | |
| **&** | : | **Jury Trial Demanded** |
| | : | |
| **TURNER SPORTS, INC.,** | : | |
| | : | |
| Defendants. | : | |

--------------------------------------------------X

Plaintiff Casey Stern hereby alleges, by and through his undersigned counsel, Wigdor

LLP, as and for his Complaint against Defendants Warner Media, LLC ("Warner Media") and

Turner Sports, Inc. ("Turner") (together, the "Company" or "Defendants") as follows:

## PRELIMINARY STATEMENT

1.      Over the course of the last two years, Casey Stern has been put through his own

personal hell, the likes of which no person should ever be forced to endure.

2.      Beginning in about December 2018 and persisting through February 2020, Mr.

Stern's three young children were allegedly subjected to heinous child abuse at the hands of their

own mother, Mr. Stern's ex-wife Shanon Stern, as well as Ms. Stern's boyfriend, Alexander

Soriano.

3.      According to the allegations, Mr. Stern's three children, who were all younger

than 4 years old at the time the abuse commenced, were systematically beaten, tortured, and

emotionally abused.  Among other criminal acts, the children were subjected to alternating hot

and cold baths that literally constituted torture, "spanked" across the face, and punched in the

stomach.  In one particularly disturbing incident one of the children had an accident and Mr.

Soriano instructed this child to drink his/her own urine off the floor.  The abuse became so prevalent and vicious that the children began wearing backpacks around the house in preparation to run away.

4.     Faced with an apathetic court system and an initially apathetic Special Victims Unit ("SVU") investigator, Mr. Stern was forced to become his own investigator and spent much of his time gathering evidence of the abuse in an effort to save his children.  In doing so, he often put himself in harm's way as he crossed paths with the violent and dangerous Mr. Soriano. Thanks in large part to his own investigative work, as well as the assistance of a court appointed guardian, Ms. Stern and Mr. Soriano were finally arrested on February 28, 2020 and charged with a combined 15 felonies.  Ms. Stern was charged with four counts of second-degree child cruelty and six counts of reckless endangerment.  Mr. Soriano was charged with five counts of first-degree child cruelty.

5.     Those who know Mr. Stern know him not for the ordeal he and his children have endured, but rather as one of the faces of Turner Sports on its television networks TBS, TNT and NBA TV.  For the past six years, Mr. Stern has worked for Turner and its parent company, Warner Media, in various capacities, but most often as a studio host.

6.     Mr. Stern began working for the Company as a studio host for TBS's coverage of the Major League Baseball ("MLB") postseason in 2014.  He performed so well in that role that the Company began to utilize him in its coverage of the National Basketball Association ("NBA") and the National Collegiate Athletic Association ("NCAA") men's college basketball. He continued to work his way up the ranks, leapfrogging several other studio hosts to become the number one studio host on NBA TV and the number two studio host overall in the entire Company, behind only the well-regarded Ernie Johnson.

2

7.     Given his stellar performance and years of dedication, as well as the nature of what he was going through, Mr. Stern understandably expected that the Company would be sympathetic and accommodating when it came to his efforts to save his children. The exact opposite occurred. Indeed, the Company was displeased with even the smallest of accommodations requested by Mr. Stern in connection with his childcare responsibilities.

8.     In one particularly offensive incident, John O'Connor, NBA TV's Executive Producer, responded to an accommodation request by suggesting that Mr. Stern was using his children – who were being beaten by his ex-wife and her boyfriend – as an "excuse" to avoid work assignments. Specifically, Mr. O'Connor said, **"When are you going to stop using this" family situation as an excuse?**

9.     During a separate incident, Olivia Scarlett, Turner's Director of Talent Relations, insensitively told Mr. Stern, who was seeking an accommodation in connection with his childcare responsibilities, **"A lot of us have nanny issues."**

10.     These statements, which are only examples, make clear that the Company believed that Mr. Stern, as a man, was expected to place his job above his family – regardless of the fact that Mr. Stern's children were the victims of severe domestic abuse.

11.     However, insensitive and discriminatory comments were unfortunately the least of the unlawful conduct to which Mr. Stern was subjected by the Company. Indeed, as anyone who watches Turner programming knows, Mr. Stern has slowly been phased out of programming over the past two years. One by one, his responsibilities were diminished and taken away from him. This was only exacerbated by the recent pandemic when Mr. Stern requested health related accommodations to ensure that he remained healthy and able to care for his children.

12.     Most recently, in September 2020, Mr. Stern was informed that he was being fired as the host of Turner's 2020 MLB postseason coverage and that his contract would not be renewed this coming August.  To make matters worse, the Company has informed Mr. Stern that, even though it will not be using him for anything anymore, he is not permitted to seek work in his chosen field until August 2021 (when his contract expires) unless he releases the Company of liability for its unlawful conduct.

13.     The Company's cruelty cannot be overstated, nor is it an isolated incident. Rather, the treatment of Mr. Stern is just the latest example of what has become commonplace practice at Warner Media and its subsidiaries.

14.     In just the last year alone, two Warner Media brands – The Ellen DeGeneres Show and TMZ – have been singled out for, among other things: verbal abuse, racism, misogyny, intimidation, and poor treatment of crews during the COVID-19 production shutdown.

15.     The misconduct was so widespread and ubiquitous that, on September 16, 2020, Warner Media's Chief Executive Officer ("CEO"), Jason Kilar, felt compelled to send a Company-wide memo addressing the toxic culture:

> I've come to the conclusion that one of the most important things I'd like people to say about us when we are not in the room is that we treat people with dignity.  What does it mean to treat a person with dignity?  At a minimum, I believe it entails a responsibility to validate, to recognize, and to include.  Finally, I believe it entails a commitment to fairness and a commitment to maintaining a safe environment for all . . . We will not be tolerating patterns of behavior that are at odds with our need to treat each other with dignity.

16.     It is evident, from the facts set forth below that the Company's treatment of Mr. Stern failed to meet even the Company's "minimum" threshold of dignity.

**ADMINISTRATIVE PREREQUISITES**

17.     On January 14, 2021, Mr. Stern filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA").

18.     On March 8, 2021, the EEOC issued Notices of Right to Sue to Mr. Stern against Warner Media and Turner.  The Notices of Right to Sue are attached hereto as Exhibit A.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and the ADA.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

21.     Plaintiff Casey Stern is an employee of Warner Media and Turner who, at all relevant times, was based in the Company's Atlanta studios.  Mr. Stern is a resident of the State of Georgia and, at all relevant times herein, met the definition of an "employee" under Title VII and the ADA.

22.     Defendant Warner Media, LLC is a Delaware domestic limited liability company with a principal place of business located at 30 Hudson Yards, 500 West 33rd Street, New York,

New York 10001.  At all relevant times, Warner Media was an "employer" within the meaning of Title VII and the ADA.

23.     Defendant Turner Sports, Inc. is a domestic Georgia corporation with a principal place of business located at One CNN Center, Atlanta, Georgia 30303.  At all relevant times, Turner was an "employer" within the meaning of Title VII and the ADA.

## FACTUAL ALLEGATIONS

I.     **BACKGROUND**

   A.     **Mr. Stern's Employment with Warner Media and Turner Sports**

24.     After a successful business career working on Wall Street, Mr. Stern embarked on a career as a sports broadcaster – his dream job.

25.     Early in his broadcasting career, Mr. Stern worked for AOL, MLB.com, and Madison Square Garden Network ("MSG") hosting a variety of shows.

26.     Mr. Stern began working as a radio host for Sirius Satellite Radio in 2008.  It was in his capacity as a radio host with Sirius that Mr. Stern first caught the attention of Turner executives.

27.     In 2014, Turner recruited Mr. Stern after Craig Barry, Turner's then-Senior Vice President of Production, became "fascinated" with Mr. Stern's baseball radio show on Sirius Satellite Radio.  Mr. Barry was particularly impressed at how well Mr. Stern managed his show and noted that Mr. Stern conducted interesting interviews.

28.     Mr. Barry told several other executives at the Company to listen to Mr. Stern's show.  They did so and were impressed.

29.     After hiring Mr. Stern, Mr. Barry stated, "If Ernie Johnson sets the bar as a studio host, Casey Stern is someone we thought could potentially fit in that same mold."

30.     Mr. Stern was ultimately hired to work as a studio host for Turner's MLB postseason coverage.

31.     Mr. Stern performed exceptionally well in this role and Turner began to utilize him in other roles, including Turner's basketball coverage.

32.     In 2016, Turner signed Mr. Stern to a contract that ran from August 31, 2016 through August 30, 2019 (the "Contract").  The Contract was extended for two years in August 2019 and runs through August 30, 2021 (the "Extension").

33.     During the period of the Contract and Extension, Mr. Stern established himself as one of the top studio hosts in the business and was entrusted with some of the Company's most important events, including coverage of: (i) the MLB postseason; (ii) the NCAA March Madness tournament; (iii) the NBA draft; (iv) the NBA's All-Star game and related events; (v) the NBA Finals tournament; (vi) the NBA trade deadline; (vii) the NBA Hall of Fame; and (vii) the NBA's free agency period.

34.     Mr. Stern also worked his way up the ranks to become the number one studio host for NBA TV, where he worked several nights per week as a studio host, and the Company's number two studio host overall behind only the well-regarded Mr. Johnson.

35.     Mr. Stern is a tireless worker and, in addition to his studio hosting duties, he also fulfilled several other functions for the Company.  Notably, Mr. Stern created, wrote and hosted "Three Point Revolution," an award-winning mini-series documentary about the NBA's three-point shot.

36.     Mr. Stern was also asked to do (and did) play-by-play on NBA TV for one nationally broadcast game per week.  The fact that the Company asked Mr. Stern to do play-by-

play is a testament to the confidence that the Company had in his abilities, as Mr. Stern had

never done play-by-play before.

37.     In recognition of his superlative work, Mr. Stern received praise both from within

the Company and outside of it.  For example:

- In July of 2015, Sports Business Journal highlighted Mr. Stern in an article titled "Finding the Next TV Star."

- Following the 2015 MLB Postseason, Turner's President, Lenny Daniels, sent Mr. Stern a note saying **"thanks for everything and great job.  It's truly a pleasure having you as part of our team."**

- Theo Epstein, former general manager of the Boston Red Sox and Chicago Cubs (and three-time World Series Champion): **"I've always respected and admired you.  It's your passion for baseball and the depth of your discussion."**

- In 2015, ESPN's Jon Sciambi told Mr. Stern, **"Bro you are so good at this."**

- In 2016, Jon Filipelli, the President of Production and Programming at the YES Network, said to Mr. Stern, **"You, my friend, are a star."**

- In 2016, Michelle Beadle of ESPN sent Mr. Stern a message saying, **"Watching you bud.  You're crushing it."**

- In December 2016, after Mr. Stern hosted coverage of Craig Sager's death, Tim Kiely, the Executive Producer and creator of Inside the NBA sent Mr. Stern a message saying, **"NOBODY, I repeat NOBODY could have done a better job than you just did.  I hope you wake up tomorrow as proud as I am."**

- In 2017, Mr. Stern was one of only approximately 100 people to receive a vote for "National Sportscaster of the Year."

- In a 2018 Forbes article, Hall of Fame pitcher, Pedro Martinez, who was Mr. Stern's MLB Postseason coverage colleague, stated, **"When we met Casey Stern, we all clicked right away.**  From there, we knew **it was a great partnership**, and that we'd talk about baseball inside-out.  **That's where the energy comes from**."

8

- In the same Forbes article, Scooter Vertino, Turner's current Senior Vice President of Production and Programming, said, "Pedro, Gary, Jimmy, and Casey enjoy being around each other, they love talking and watching baseball. **That relationship and their chemistry shine through on set**."

- A 2018 Uproxx feature said of the MLB show that Stern hosted: "Along with Gary Sheffield and Jimmy Rollins, Martinez and Stern are the faces of TBS' baseball coverage, setting up and finishing the network's coverage of the postseason together the last two Octobers. For 13 regular season games, then the Wild Card round and National League Division and Championship Series, **the show has offered a unique look at America's pastime with the charm and wit that's become a signature of other Turner Sports broadcasts**."

- In 2018, Mr. Stern was nominated for a Cynopsis Award for best host in a sports-related web series.

- WNBA Champion and two-time MVP, Candace Parker: **"I mean it, really, you are definitely the best host I have ever worked with."**

- MLB World Series Champion and National League MVP, Jimmy Rollins: **"You are great at what you do. Thanks for showing me the ropes and making everything so easy up there."**

- MLB World Series Champion and All Star, Cliff Floyd: **"You are great. I've worked with a lot of people. Trust me. You're great fam."**

- NBA All Star, Rex Chapman: **"You don't even realize how good you are. It's a whole difference experience when you're up there."**

- Turner sportscaster, Lauren Shehadi: **"You make the giants in the sport laugh and relax and be informative yet goofy."**

- Sportswriter Seth Davis: **"You know how great you are. It's seamless up there. Proud of you."**

**B.    Mr. Stern's Children Are Victims of Abuse**

38.     Mr. Stern is a single father who is the sole caregiver for his three young children, ages six, five, and three.  For the last two years, Mr. Stern and his children have been living through a terrible ordeal, the likes of which no parent or child should ever have to endure.

39.     Mr. Stern and his ex-wife, Shanon Stern, divorced in 2017, agreeing to joint custody of their three children.

40.     In December 2018, Mr. Stern's three children (all younger than four years old at the time) allegedly began to be subjected to severe abuse at the hands of Mr. Stern's ex-wife and her boyfriend, Alexander Soriano.

41.     In January 2019, Mr. Stern and his ex-wife agreed to a temporary restraining order that barred Mr. Soriano from being around Ms. Stern or the children.  Additionally, a court-appointed "guardian" was assigned to the case to help protect the interest of the children.

42.     Despite the restraining order prohibiting Mr. Soriano from being in the presence of the children, the abuse lasted another nine months, until September 2019, according to the allegations.  The details of the abuse, as alleged, are graphic.

43.     For a period of nearly one year, Mr. Stern's ex-wife and Mr. Soriano ruthlessly abused Mr. Stern's children, both physically and emotionally.

44.     By way of example, Mr. Soriano "spanked" one of Mr. Stern's children across the face and punched the child in the stomach.

45.     The children were also subjected to alternating hot and cold baths that literally constituted torture.

46.     In another particularly horrifying incident, one of Mr. Stern's children had an accident and the child was directed by Mr. Soriano to drink the child's own urine up off the floor.

47.     Furthermore, it was not uncommon for the children to come home with unexplained bruises after spending time at their mother's home.

48.     The abuse became so intense and prevalent that, in anticipation of running away and fleeing the abuse, Mr. Stern's children began to wear backpacks around the house.

49.     To compound matters, Mr. Stern was prevented from learning the details of this abuse because the children were coached not to tell anyone.

50.     When Mr. Stern finally did learn enough to take the case to the authorities in January 2019, a Special Victims Unit ("SVU") investigator declined to investigate the allegations of abuse.  After this, Mr. Stern became his own investigator and spent much of his time gathering evidence of the abuse in an effort to save his children.  To gather the necessary evidence, Mr. Stern was forced to put himself in harm's way.

51.     During one check-up on the children, the court-appointed guardian spotted Mr. Soriano's car in front of Ms. Stern's house in violation of the restraining order.  Needing a second witness, the guardian called Mr. Stern to come to the house and observe the car there. Mr. Stern immediately drove to the home.

52.     When Mr. Stern arrived at Ms. Stern's home, Mr. Soriano was at his car getting something out of the trunk.  Mr. Stern drove past Mr. Soriano's car and snapped several photographs of him.  When Mr. Stern looped back around a second time, Mr. Soriano stood in the middle of the street threateningly with a golf club in his hand.

53.     As Mr. Stern sped around him, Mr. Soriano jumped into his car and forced a high-speed chase.  After several minutes of being chased, Mr. Stern was eventually able to shake Mr. Soriano and return safely home.

54.     On February 28, 2020, more than one year after the restraining order was entered against Mr. Soriano, he and Ms. Stern were charged with a combined 15 felonies.  Ms. Stern was charged with four counts of second-degree child cruelty and six counts of reckless endangerment.  Mr. Soriano was charged with five counts of first-degree child cruelty.

## II.     MR. STERN IS PUSHED OUT OF TURNER

### A.     The Company Begins to Discriminate Against and Marginalize Mr. Stern because He is a Man with Childcare Responsibilities

55.     As noted above, Mr. Stern was a rising star within the Company who had leapfrogged his way up the depth charts and earned increasingly important assignments.  All of that stopped, and his career progression reversed, when the Company learned about his family troubles and began discriminating against Mr. Stern because he is a man.  Indeed, the company believed that as a man, Mr. Stern should be obligated to subjugate his family and always put work first.

56.     In or around August 2019, Mr. Stern arranged to have another host cover for him for 30 minutes in connection with his childcare responsibilities.  This was a normal occurrence at the Company and, as long as a host arranged for coverage, there was never an issue.  Mr. Stern cleared this coverage with NBA TV's Executive Producer, Mr. O'Connor, and proceeded to tell Olivia Scarlett, Turner's Director of Talent Relations.  Ms. Scarlett became irate, telling Mr. Stern that the shift was his responsibility and that he was not allowed to make the switch.  When Mr. Stern advised Ms. Scarlett of his childcare situation, Ms. Scarlett insensitively stated, **"A lot of us have nanny issues."**  Of course, having your children punched in the stomach, tortured, and directed to drink their own urine is a far cry from "nanny issues."

       **1.**     **Mr. Stern is asked to work on his day off and assured of his important role in the Company**

57.     In the Fall of 2019, Senior Manager of Talent Services, Michelle Zarzaca, and Vice President of Talent Relations, Tara August, called Mr. Stern to ask him to host Inside the NBA on TNT in connection with an NBA preseason game on what was a scheduled day off.

58.     Mr. Stern's scheduled day off was between two long, grueling days of working on TBS's MLB Postseason coverage.

59.     To convince Mr. Stern to accept the assignment, Ms. Zarzaca and Ms. August specifically told Mr. Stern that he was the only person who would be hosting Inside the NBA other than Mr. Johnson.  Indeed, for three years Mr. Stern was literally the only fill-in host for Mr. Johnson on the perennial Emmy winning Inside the NBA.  However, this was the first in what turned out to be a pattern of false statements made to Mr. Stern about his role at the Company as he was being phased out because he was a man with childcare responsibilities.

60.     Approximately one month later, the Company added an additional day of Inside the NBA to air on Tuesday nights.  Despite the assurances of Ms. August and Ms. Zarzaca that only Mr. Stern and Mr. Johnson would host Inside the NBA, the Tuesday night episode was given to Adam Lefkoe.

61.     Mr. Lefkoe, who worked for Bleacher Report – another Turner property – had never previously worked as a studio host for the Company.

62.     In a futile effort to explain the decision, Ms. August attempted to portray the Tuesday night show as something "different" from the already existing editions of Inside the NBA.  It was not.

**2.      Mr. Stern is removed from the Company's NCAA basketball coverage and reassured of his important role in the company**

63.      In January 2020, Mr. Barry, who is now Turner's Executive Vice President / Chief Content Officer, texted Mr. Stern to ask him out for breakfast.  Mr. Barry specifically told Mr. Stern, "It's nothing urgent…just want to catch up."

64.      Despite portraying the meeting as a casual breakfast to "catch up," within the first five minutes Mr. Barry told Mr. Stern that he would no longer be hosting the Company's NCAA March Madness coverage.

65.      Mr. Barry portrayed this as a business move and told Mr. Stern that Turner simply wanted to give the job to "a college basketball guy."

66.      Mr. Barry reassured Mr. Stern that this move had nothing to do with his performance and that his other roles in the company were safe.  Specifically, Mr. Barry said about Inside the NBA on TNT, "No one is going to sit in that seat under any circumstances except [Mr. Stern] and Ernie Johnson."  Of course, this was disingenuous because Mr. Lefkoe was already hosting the Tuesday night edition of Inside the NBA on TNT.

67.      Mr. Barry further told Mr. Stern that he was still "the man" at NBA TV and that there were no issues with his performance.

68.      Immediately after his breakfast with Mr. Barry, Mr. Stern received a text message from Ms. August saying that she knew Mr. Stern had a meeting with Mr. Barry and that she wanted to talk with him after.

69.      When they spoke, Ms. August reiterated that Mr. Stern was still the number one studio host at NBA TV.  As it turned out, that statement was untrue.

70.      Mr. Barry's statement that the Company wanted to bring in a "college basketball guy" also turned out to be untrue.  At the time, there were five finalists who were being

14

auditioned for the role.  None of them had significant experience covering college basketball. The leading candidate, Lauren Shehadi, was a baseball sideline reporter who had never even done studio work for Turner.

71.     It was not until all five finalists were rejected that the job was ultimately given to Adam Zucker who was less qualified than Mr. Stern.

### 3.     The Company makes it clear that, as a man, Mr. Stern's job should be placed before his childcare responsibilities

72.     Shortly after his conversation with Mr. Barry, on January 16, 2020, Ms. Zarzaca approached Mr. Stern while in studio for NBA TV and asked to speak with him in private.  Ms. Zarzaca explained to Mr. Stern that the Company was creating a reality show contest revolving around finding the next NBA general manager.

73.     Mr. Stern expressed to Ms. Zarzaca that he did not think he wanted to host that show (which he later learned was just a series of vignettes that would run during another program on NBA TV).  Mr. Stern was concerned about the hours for the show (which were Monday through Friday from 8:00 a.m. to 5:00 p.m.) because they would have substantially interfered with his childcare responsibilities.

74.     Upon being told that Mr. Stern did not want to work on the new show, Ms. Zarzaca began to cry and told Mr. Stern that "the channel [NBA TV] is going down" and told him that he was the only one who could do that job.

75.     Concerned at hearing that NBA TV might "go down," Mr. Stern spoke to Mr. O'Connor the next day.  Mr. O'Connor laughed at the suggestion that NBA TV was in jeopardy and told Mr. Stern that it was not true.

76.     Mr. Stern advised Mr. O'Connor that he did not want to host the new show because he needed to care for his three children (who were victims of severe child abuse).  Mr.

O'Connor outrageously and offensively suggested that Mr. Stern was using his family situation as an insincere excuse to avoid work.  Specifically, he asked, **"How long are you going to use this" family situation as an excuse?**

77.     On the same day he met with Mr. O'Connor, Mr. Stern met with Turner's President, Mr. Daniels, as well as its Senior Vice President for Content, Scooter Vertino.  Mr. Stern explained his family situation to Messrs. Daniels and Vertino, who claimed not to have known anything about Mr. Stern's family situation.

78.     Both men (falsely) assured Mr. Stern that his standing and position atop NBA TV would not be impacted.  Heartlessly, neither Mr. Daniels nor Mr. Vertino ever reached out to Mr. Stern to inquire as to his well-being following these January 2020 meetings.

### 4.     Mr. Stern is omitted from the Company's NBA trade deadline coverage and has his role in the NBA All-Star game coverage cut in half

79.     On February 6, 2020, just weeks after his conversation with Mr. O'Connor, the Company discriminatorily left Mr. Stern out of its NBA trade deadline coverage.  Mr. Stern had hosted this coverage for the previous three seasons.

80.     When Mr. Stern's agent, Rick Diamond, asked Ms. August why Mr. Stern was left off that coverage, Ms. August told him that they simply "forgot" to put him on the schedule. This is a preposterous excuse, as the trade deadline coverage is planned out far in advance and it is inconceivable that Mr. Stern, who, as noted, was the host of the trade deadline coverage for the prior three years, was inadvertently left out.  The Company simply did not believe that a man with childcare responsibilities would be able to perform the full scope of his work effectively.

81.     Then, in mid-February 2020, Mr. Stern was scheduled to travel to Chicago to cover the NBA All-Star game (which took place on February 16, 2020) and the events surrounding it.

82.     Mr. Stern learned that his All-Star duties were cut in half from prior years.  Ro Parrish was scheduled to host a segment with Shaquille O'Neal that was previously hosted by Mr. Stern, and Adam Lefkoe was schedule to host Inside the NBA on TNT – a seat Mr. Barry stated just several weeks prior would be filled only by Mr. Stern and Mr. Johnson.

83.     Several days prior to the All-Star trip, Mr. Stern was notified by the SVU investigator that his ex-wife and her boyfriend would be arrested in the coming weeks.  The precise timing of the arrest was unknown, and Mr. Stern was advised to be with his children at all times and not to travel.

84.     As a result, Mr. Stern advised Ms. August that he was unable to go to the All-Star game.  Mr. Stern advised Ms. August of the reason he could not go to the All-Star game, and she told him that she understood and (falsely) reassured him that this would "never hurt [his] career."

85.     Notwithstanding the Company's knowledge of what Mr. Stern was going through, not a single member of the Company's leadership called to ask how Mr. Stern was doing or whether he needed any assistance in dealing with this horrific situation.

86.     Following the arrest of Mr. Stern's ex-wife and Mr. Soriano, the Company scheduled Mr. Stern to return to the air on NBA TV on March 15, 2020 – the same day that Turner's NCAA Selection Sunday coverage was scheduled to air on CBS through a partnership with that network.  The NCAA Selection Sunday show studio is in the same building as the NBA TV studio.  Thus, in a cruel twist, Mr. Stern was scheduled to work just down the hall from the show from which he was just recently fired.

87.     Ultimately, the NCAA Selection Sunday show never happened, and Mr. Stern did not return to work on March 15, 2020 because of the COVID-19 pandemic.

### 5.     The Company Increases Its Unlawful Discrimination Against Mr. Stern in Connection with the COVID-19 Global Pandemic

88.     In mid-March 2020, production of many Turner Productions was halted along with most productions around the sports world.  However, the Company continued to film some productions remotely before eventually requiring some employees, including Mr. Stern, to return to studios.

89.     During this period, the Company stepped-up its discrimination against and marginalization of Mr. Stern by denying him accommodations necessary to ensure his safety and casting him out completely once he voiced concern for his safety.

90.     Following the closure of Turner studios, it took two weeks before the Company permitted Mr. Stern to return to the air.  This is despite the fact (known to the Company) that Mr. Stern was already hosting a nationally broadcast radio show from his home and had access to professional equipment.  Other hosts did not have access to such sophisticated equipment.

91.     Even at this point, Mr. Stern was given just one to two hosting shifts per week. Despite the reduced workload, Mr. Stern remained dedicated and performed excellent work. Indeed, after many of those shifts, the producers texted Mr. Stern to tell him that he was "on [his] game" or that he made the show "fun."

92.     Nevertheless, around May or June 2020, Mr. Stern was scheduled to host just one show over a 23-day span.  When Mr. Diamond inquired as to why Mr. Stern was not being given work, he was told that it was an "oversight."  Given that Mr. Stern was the Company's top studio host behind Mr. Johnson, it is simply not credible that the Company just forgot to schedule him.

93.     When certain employees were required to return to studios to work, this requirement created a particularly dangerous situation for Mr. Stern.  Specifically, Mr. Stern is asthmatic and is therefore in the "high-risk" category when it comes to the COVID-19 virus.

94.     In addition to the fact that a COVID-19 diagnosis would be life-threatening, Mr. Stern was further concerned about the well-being of his children in the event he became incapacitated.  Given that his ex-wife is currently being prosecuted for endangering his children, they most likely would end up wards of the state in the event that Mr. Stern is no longer able to care for them.

95.     Notably, although hosts were required to be physically present in the studios, analysts were permitted to work from home.  This incongruous treatment, for two positions that are substantially similar, needlessly put Mr. Stern's health and safety at risk.

96.     Despite being asthmatic, Mr. Stern was never offered the same accommodations that were provided to the Company's former superstar athletes – even those without medical conditions.

97.     Despite all of the foregoing, Mr. Stern agreed to come into the studio to host on August 5, 2020.  The very next day, Mr. Stern received an email notifying him that two individuals who were in the building on August 5, 2020 had tested positive for COVID-19.

98.     On August 7, 2020, Mr. Stern told Ms. August – for all of the reasons described above – that he could not return to the studio for at least several weeks.  Ms. August advised Mr. Stern that it was "no problem," but that she would follow up with him in one week.  Ms. August never did contact Mr. Stern about returning to the studio.

99.     That same day, after Mr. Stern advised Ms. August that he was not ready to return to the studio, Ms. Zarzaca sent Mr. Stern an email stating: "[Y]our health and safety [are] the

most important thing[s]. . . .We will figure it all out so don't worry, take care of yourself and your family first."

100.    Likewise, on August 17, 2020, after Mr. Stern advised the Company that he was still not ready to return to the studio, Mr. O'Connor sent Mr. Stern an email stating:

> There is no reason to feel sorry or bad about any of this.  In fact it's noble that you are putting your kids first as well you should and when they get older they will know that dad always looked out for their best interest.  That['s] what being a great parent is about so feel good about that.  No concerns from anyone.

101.    Of course, these purported well wishes – including from a man who accused Mr. Stern of using the abuse of his children as an excuse to skirt work responsibilities – was entirely disingenuous.

**B.    The Company Removes Mr. Stern from its MLB Postseason Coverage and Unlawfully Notifies Mr. Stern that He is Relieved of All Other Job Duties**

102.    On September 11, 2020, Mr. Stern was told that he and Gary Sheffield were being removed from the Company's MLB postseason coverage and being replaced by Mr. Johnson and Curtis Granderson, respectively.  Mr. Stern was also informed that he would no longer be given any responsibilities whatsoever at the Company and that his contract would not be renewed.

103.    Mr. Stern was told about his removal from the Company's MLB postseason coverage just 12 days before these changes were publicly announced on September 23, 2020.

104.    In the lead-up to these changes, Mr. Stern had heard from producers at the Company that big changes were being made to the MLB postseason coverage.

105.    Mr. Stern and Mr. Diamond had repeatedly asked whether changes were being made for the MLB postseason coverage.  Over a period of several months, they were repeatedly told be several people at the Company, including Ms. August, that no decision had been made. This would turn out to be just another false statement from the Company to Mr. Stern.

106.    In fact, even while Ms. August told Mr. Stern and Mr. Diamond that no decisions had been made (including about Mr. Sheffield), Mr. Stern had already learned several weeks prior that Mr. Sheffield was being replaced.

107.    Clearly, following the aforementioned issues related to childcare and COVID-19, the company had plans in place to replace Mr. Stern as well but refused to disclose them until the last minute.

108.    That same day, Mr. Stern was advised that the Company would no longer be giving him any assignments and that his contract would not be renewed.  This shocking termination was the culmination of years of unlawful discrimination against Mr. Stern.

III.    **MR. STERN'S COLLEAGUES ARE SHOCKED BY HIS DIMISSAL**

109.    Throughout his time at Turner, Mr. Stern repeatedly proved himself to be a superb studio host for Turner's MLB, NBA, and NCAA basketball coverage.

110.    At no time during his employment did Mr. Stern's performance ever falter.

111.    Indeed, despite being the sole caretaker of three young children who were the victims of outrageous abuse from Mr. Stern's ex-wife and her boyfriend, Mr. Stern never missed a beat.

112.    Although the Company gradually removed Mr. Stern from its shows and reduced his airtime, they continuously assured him that the decisions had nothing to do with his performance.

113.    Ms. August confirmed to Mr. Diamond on numerous occasions that Mr. Stern was performing his job at a high level.

114.    Likewise, Mr. O'Connor and Mr. Barry both expressed that Mr. Stern was performing at a high level and that none of the changes were performance related.

115.    After Turner informed Mr. Stern that they would not be providing him with any additional assignments for the duration of his contract, several of Mr. Stern's Turner colleagues sent him messages of support and praising him for maintaining the same high level of performance even throughout his ordeal.

- Emmy Award Winning Host and Reporter, Ro Parrish: **"I admire you for showing up and consistently performing at a high level while you were going through hell behind the scenes."**

- Senior Production Assistant Chris Nelson: "It truly goes to show you never know what someone is going through outside of work, although it never showed with you because **you always did an amazing job.** I always appreciated how you treated everyone in the production, how professional yet laid back you were, and how naturally you did your job."

- Broadcast Production Specialist Miki Marshall: "I would like to say that working with you has absolutely been my pleasure and your absence was felt even through the pandemic. **You brought levity, quick wit, perspective, and camaraderie into a place that desperately needs it."**

- Voice Over Talent Matt Dagostino: "You've always seemed like someone who was having fun and always laughing. **It must have been difficult to 'put the happy face on' with everything happening off the camera."**

- Director of Sports Production Alisa Deanes: "It was always a pleasure to work with you but I'm sure like others, I had no idea what you were going through 'behind the camera.' **The way that you were able to perform your job but most importantly father your children without missing a beat is heroic."**

## <u>FIRST CAUSE OF ACTION</u>
### (Discrimination in Violation of Title VII)
#### *Against All Defendants*

116.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

117.    Defendants discriminated against Plaintiff on the basis of his sex in violation of Title VII by, *inter alia*, denying Plaintiff equal terms and conditions of employment and treating him differently because he is a man with childcare responsibilities.

118.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

119.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

120.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Discrimination in Violation of the ADA)**
***Against All Defendants***

121.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

122.    Defendants discriminated against Plaintiff on the basis of his disability in violation of the ADA by, *inter alia*, denying him equal terms and conditions of employment, and failing to provide a reasonable accommodation.

123.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages.

124.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

125.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the ADA, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Retaliation in Violation of the ADA)**
*Against All Defendants*

126.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

127.    Defendants retaliated against Plaintiff for engaging in protected activities in violation of the ADA.

128.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

129.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the ADA, for which Plaintiff is entitled to an award of punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Casey Stern prays that the Court enter judgment in his favor and against Defendants Warner Media, LLC and Turner Sports, Inc., containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B.      An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his emotional distress;

E.      An award of punitive damages, in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      An award of Plaintiff's reasonable attorney's fees and costs to the fullest extent permitted by law; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 12, 2021
New York, New York                          Respectfully submitted,

**WIGDOR LLP**


By:  */s/ Michael J. Willemin*
*/s/ Anthony G. Bizien*
Michael J. Willemin (to file a motion
for *pro hac vice*)
Anthony G. Bizien (to file a motion
for *pro hac vice*)

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
mwillemin@wigdorlaw.com

25

abizien@wigdorlaw.com

*Counsels for Plaintiff* (to file a motion
for *pro hac vice*)


/s/ James Radford_____
James Radford
Georgia Bar No. 108007
james@decaturlegal.com

RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0302

*Counsel for Plaintiff*